The argument is Reed v. Wexford Health Sources. Mr. Rubin. Mr. Wexford, if you please the court. Plaintiff tried this case under a Monell theory of liability, claiming a widespread practice by Wexford of refusing to authorize surgical repair of abdominal hernias until the hernia, and unless the hernia was strangulated or incarcerated. This required plaintiff to prove the existence of this widespread practice, corporate knowledge, deliberate indifference to the risk posed by this practice, and that the practice was a moving force behind the harm the plaintiff claimed that he suffered. Plaintiff failed at trial to introduce evidence sufficient to support a finding on any of these three essential elements. The Supreme Court and this court have repeatedly cautioned allowing Monell claims to collapse into respondeat superior, and that's exactly what happened here. Wexford is entitled to judgment as a matter of law under Federal Rule of Civil Procedure 50, and additionally, the district court committed prejudicial errors at trial that denied Wexford a fair trial, entitling it to a new trial under Federal Rule of Civil Procedure 59. Can I confirm on that point, though, Mr. Rupich, that you are, in the first instance, you're asking us to reverse and remand with instructions to enter judgment in favor of the defendant Wexford? That is correct, Your Honor. So the new trial business is all in the alternative? Our argument, first and foremost in primary, is that the evidence was insufficient as a matter of law, such that the case should be, the judgment should enter on remand for Wexford, and there would not be a new trial. And am I right in reading your brief to say, indeed, in your view, the district court committed error in even admitting the proffered expert testimony of Dr. Clay D. Mattai? So it never should have even been, it never even should have been before the jury. And then once it was before the jury, you have, as you argue, a verdict supported by insufficient evidence. Yes, Your Honor. First off, the evidence should not have been admitted. It wasn't properly disclosed. It was conclusory and lacked foundation for the reasons we said. But that goes to the new trial. If Your Honors look at that testimony, it didn't provide any evidence sufficient to support the existence of this widespread practice. It was a bottom line conclusion from a gastroenterologist that a widespread practice existed. We did not hear testimony from any other persons in custody to whom this applied. We saw no medical records of other persons in custody. And Dr. D. Mattai did not testify to a review of medical records of other individuals in custody in similar circumstances such that a jury could even infer the existence of what needs to be essentially Wexford standard operating procedure. This is how they act in this situation with a reducible hernia. They wait until it strangulates or incarcerates. And here there was no strangulation or incarceration, correct? That is correct. And that goes to our moving force causation argument. The theory is untethered from Mr. Reid's personal experience. That actually raises, in my mind anyway, the question whether Reid has standing to sue. If he wasn't injured by the supposed policy, why is this within the scope of Article 3? Well, he's claiming an injury, but he's attributing it to... He was, in fact, referred to a surgeon before the hernia was strangulated or incarcerated. I understand that's undisputed, right? Right. So I will devote more time, doubtless, with Mr. Pallura, but if the policy didn't prevent a surgical referral for him, how was he injured by the policy, even if that was the policy? We treated that as a failure of the evidence, a failure of proof, a failure of his theory. It's also a failure to allege injury. Well, we'll talk about this with Mr. Reid's lawyer. Yes, Your Honor. Mr. Rupich, how do you think it got to this? I mean, at what stage did the train get off the track, such that we've got a theory that differs from the evidence? At what point did this occur? Is it just a cumulative inertia that ends up resulting in a jury verdict on this evidence? Yes. So I believe it was pleaded. It was in the final pretrial. It was briefed at summary judgment. Summary judgment, we moved. It was denied and proceeded to trial. And our argument, one of our arguments, was that you can't link them, that they don't line up. It's a square peg. It's a round hole. But to answer your question, it wasn't a last-minute thing that happened at trial. This has been the plaintiff's theory. I thought what you might say in response to Judge Brennan was that set aside the comment or the question Judge Easterbrook has about Article III subject matter jurisdiction at the outset. But it seems to me that there's a very substantial question here about whether the district court committed error in the pretrial phase in ruling that Dr. DeMattei's opinion is relevant, reliable, and going to be admissible at trial. Well, we agree we filed a dauber motion. Yeah, and then that was denied. And then you filed a series of in limine motions. As I understand the record where you were saying, Judge, there's a real problem with this expert evidence. And all that was denied. And then it got to trial. And then you have the verdict that came back. And now we have an appeal. I would say we were persistent in making our view heard, including the objections at trial to the testimony referencing orders in limine. The district court saw things differently. But we believe that was prejudicial error because that opinion, essentially, we were not able to explore it during discovery. These six to ten other individuals that apparently supported this theory, we would have, if that had been properly disclosed, and evidence had been disclosed in discovery of their situations, that would have been how this should have gone. I see I'm saying something that's got your... It's confusing me a little bit because I thought, well, you did depose Dr. DeMattei. Yes. And I think I have it in front of me somewhere here. You did explore it. He just didn't have an answer for you. We explored it. The way this typically would go is the comparators would... We would get the names. We'd get a third-party HIPAA order. We'd get the records. The expert could opine on the records. The expert should not be saying a policy or practice exists, but he can explore the records. We can cross if the... Yeah, all you're saying, I think, is that the reason you couldn't do what you wanted to do in the deposition is because the 26A2B disclosure was deficient. That's absolutely correct. Yeah, I got it. I understand what you're saying. All right. Similarly, the deliberate indifference prong of the Monell claim, plaintiff was unable to point to anything in their response brief that would support that Wexford knew of and condoned this nebulous wait till it strangulates policy. Typically, that evidence would be from repeated past conduct from which the corporate defendant can infer the existence of the policy, and then, as the Dean case says, similar constitutional violations from the policy or the practice. And there's just no evidence in this record linking Mr. Reed's experience, his purported delay back to Wexford as an entity. On the moving force causation, I won't belabor that as we've already talked about it, but there is simply no basis linking this phantom practice to Mr. Reed since his hernia was not incarcerated or strangulated. In total, Mr. Reed, the plaintiff failed to provide evidence to support a finding on any of these three essential elements. We additionally moved and renewed our argument that punitive damages were inappropriate in this case. They, according to Smith v. Wade, a long line of cases, they must be supported by evidence of an evil motive or intent, callous, reckless indifference to federally protected rights, and a $500,000 punitive award in this case for a corporate defendant that had no involvement in the care until it was asked to approve a consult and did it, and approved every follow-up, approved second opinions, approved outside shots, approved a second surgery. And there's just no basis to punish this defendant to the tune at all, or much less to the tune of a half a million dollars. In our motion for a new trial, there were several issues we raised concerning the disclosure of Dr. DeMattei. His opinion principally on this widespread practice that he testified in conclusory form was not sufficiently developed in discovery, and the opinion he gave- Did you have a statistician look at Wexford's records? I did not. I mean, I can think of two ways to show that the policy in operation differs from the policy on paper. One is to draw a random sample of all prisoners with hernias and find out when, if at all, they're referred for surgery. The other is to draw a random sample of those who were referred for surgery and see what the status of the hernia was at the time. A statistician could tell you whether there's a significant departure from the stated policy. You didn't do it. I gather that Mr. Reed didn't do it either. It was not done. I would agree- Now, of course, the plaintiff is the one with the burden of persuasion or the risk of non-persuasion. Yes. We did not affirmatively seek that evidence. It was not put forward in the first instance. It's the kind of evidence you would expect Wexford to have on hand just to see how well it's doing. How does Wexford know if its policy is working right if it doesn't gather that kind of evidence? I cannot speak to all data that it has, whether it could look at all hernia referrals that are sent out and then determine- If their theory were true, picking up the thread, we would only see referrals for incarcerated and strangulated hernias, right? That's right. If you look at the referrals, they would all be for incarcerated or strangulated hernias. Wexford should be able to tell whether that's true. That should be in Wexford's own records. If it sees that, it should know its policy is being misapplied, as you've told us the meaning of policy. Presumably, whether you're a healthcare services company or an airframe manufacturer, you gather that kind of data and see whether your policy is working. But I gather Wexford doesn't gather the data? It's not in the record in this case. I can answer your question if you want me to answer it. No, no. It's limited to the record. I believe the data exists. I'll leave it at that. But we know there's one individual who would not fall into that category of just referrals for incarcerated and strangulated hernias, and that's Mr. Reed. I did briefly want to touch on the question of whether an expert should be giving a bottom line conclusion on the existence of a policy or practice. This is something I've run into a lot, and it's something I object to vociferously, and I did in this case. I don't believe it's appropriate. I don't think a medical expert should be drawing the jury's conclusion. I believe it's a jury question whether a widespread practice exists at all, and in the event this case were to be remanded for a new trial, that would be an issue on remand. Thank you, Mr. Rubich. Mr. Pleura. May it please the court, counsel. My name is Tom Pleura. A lot of talk about Dr. Gamati. Before we do that, we need to talk about federal jurisdiction. How was Mr. Reed injured by the supposed policy of not referring to a surgical specialist until the hernia was incarcerated or strangulated? Please face the court. My client got castrated while he was waiting to be sent for surgery. He was castrated, his right testicle removed. Could you explain how he was injured by the supposed policy? Okay. So they have a facially unconstitutional custom and practice of not referring.  Counsel. Yeah. This very policy has already been sustained by this court against a constitutional challenge. Your argument is that the policy is not carried out as written. I'm trying to figure out how your client was injured by the policy. I'm not. You're talking about this court ruling on the written policy. We are not talking about any written policy. We are talking about their custom and practice, which does not refer patients like Mr. Reed for surgery unless he incarcerates or he strangulates. And in this case, he filed a lawsuit, and that's what spurred things. But he doesn't have to. I wish you would address my question. Okay. Could you explain how Mr. Reed was injured by the supposed policy, by the policy that you contend exists? Sure. When he was referred to a surgeon before his hernia was incarcerated or strangulated. There is no requirement under the United States Constitution for a patient that, like— Counsel, please, listen to my question. Sure. I'm not asking you to address constitutional law. I am asking you to explain to me as a factual matter how your client was injured by the asserted policy. He was injured because of the delay in treatment, which led to pain, disability. He was being forced to reach into his pants and hold his hernia up from his testicles. There was testimony where his testicles and the hernia had dropped down halfway down to his leg. So that's an injury, that injury forcing that patient to wait. And he wasn't given a single Tylenol in a year, not one Tylenol. But the policy concerned the strangulation and the incarceration. Well— Let me finish. If that hadn't happened yet, how could they be responsible for violating the policy? That's the question. If they don't refer a patient out until their custom and practices don't send them until it incarcerates or strangulates, they ignore the pain. They ignore the disability. They ignore the fact that he lost his testicle because of the delays. And Dr. Damati testified to that. We can't ignore all of the law leading up to that, though, which provides that for it to be a deliberate indifference constitutional violation, it's necessary that there be that custom and practice. You've advocated that there was a policy, but then the facts in this case don't show a violation of that policy. This isn't a medical negligence case. This is a deliberate indifference constitutional violation case. They do show that because he was never referred out, he is sending out letters to the warden. He's doing the grievances, saying, I need to be sent out for my surgery. I need pain medicine. He filed four different grievances starting in November. He filed a grievance, an emergency grievance, on Christmas Day. Mr. Plura, can I try an iteration of the same question? Yeah. Here's what I understand that you're saying. Correct me if I'm wrong. What you're saying is, I agree with the court that my client, Mr. Reed, he did not have an incarcerated or strangled kid. I agree. He did not. I agree. But what he did have was a hernia condition that was resulting in terrible pain and discomfort for a long period of time. Yes. And what you're saying, I think, is that, no, no, no. I'm not arguing that it violates the policy written down on that piece of paper. That's not my argument. My argument is that it violates a different policy. A policy that operated in practice. That's correct. Whereby the defendant, with people like Mr. Reed, was delaying treatment. Intentionally. Okay, fine. That's exactly. That's the theory. We have tried to separate out, and we did. They filed a motion in limine to bar Dr. Damati from testifying about the written policy. Wexford's written policy. This has nothing to do with the written policy. All right. I think we got it framed okay. Yep. Okay. Now, here's what I'm concerned about. Sure. I think I understand what the claim was. What is the pattern in practice evidence that you put before the jury? What do you see it as?  Twice one is two. We submitted the evidence of Mr. Reed going in repeatedly, asking to be referred out, asking for pain medicine, and individually he had repeated multiple episodes. Okay, right. But his own experience can't prove the pattern in practice. It can prove a miserable experience. No, it can. Under GLSEN, it can. Under GLSEN, it can constitute an individual doesn't have to come in and prove, okay, I got 20 other inmates. Repeated instances against one individual, and we have that from August. Okay, keep going. What else do you have? Okay. So he's told Wexford doesn't do surgeries electively on hernias. That came directly from the agent or the employed physician, Dr. Larson. Additionally, we had the testimony. Now, they filed a motion in limine saying you can't bring in, we don't want any other information in about other inmates because all of those cases had been disclosed, and the judge said what about it? Mr. Plour, we don't have any intention to go in and have five trials within a trial. What Damati is going to testify to is and what they had the disclosures of was all of the cases. We had the same expert. We had the same counsel. When you say all of the cases, what is in the sample of all? Well, we had Bryant hernia case. We had the Noser case. We had the Davis case. The cases you referred to Dr. Damati, right? Yes. The cases you referred. Yes. Did Dr. Damati draw a sample of all of the cases involving hernias? All 12,000 to 15,000? No. Dr. Damati did not do that inside the prison system. Did he look at a sample of the cases that were referred for hernia surgery? No, he did not. Those are the two ways one might think of showing what Wexford's policy is. Otherwise, what you have is anecdotes. Well, I disagree with the court on that. I don't believe that that would be the only way to do that, nor do I think it would be realistic to think that a pro se inmate could figure that out. I don't believe that Dr. Damati is a pro se inmate. No, Dr. Presumably he knows what he's doing. He does. He's done over 1,000 surgeries, hernia surgeries. An expert in hernia surgeries is not the person you needed. You needed a statistician. Yeah. And I respectfully disagree that the case law would require an inmate, who it's very rare that we would even have an expert. He is not a statistician. You needed expert testimony to show what the policy was, rather than just what your clients wanted to say to Dr. Damati. There's a big difference between your clients and Wexford's policy. You may not think there's a difference, but as a statistical matter, there is. And the right testimony comes from somebody who does a statistical analysis. I don't think the Constitution requires that. I don't think our U.S. Supreme Court requires that to prove a deliberate indifference in the prison setting for health care that the inmate would be required to get a statistician. I don't believe there's any case law to support that. I think it's very unusual that an inmate would get to this status, to where he's actually denied care for a year and then loses testicle because of that. And I don't think the fact that he didn't go out, or I didn't go out and retain or hire a statistician, would bar him from recovery. Because this court has substantiated just simply having pain is enough to prevail and get to the jury on a deliberate indifference case. You mentioned GLSEN, so I assume you have some familiarity with the Supreme Court's Minnell case law and our Minnell case law.  It is not as tepid as you're portraying. There are a series of hurdles that both parties have to go through, and Mr. Rupich described those, including what are the evidence of comparators, the ability to be able to set up a pattern of practice. Otherwise, Big Muddy is in Jefferson County, Illinois. That would be where the case would be versus some type of a federal claim. Sure. Your Honor, in our brief, we cite that one comparator is enough. We cite the case law that says there isn't any magical number that you would have to go out and do a statistical analysis. One case, one person is enough, and we've cited those in our brief. If there are repeated instances of denying him his treatment, and that happened over a year period, and it happened in the face of four grievances and repeated requests for care and treatment, and to say that Wexford didn't know about it, Wexford actually, the prison contractor, they approved a referral out. They didn't approve surgery. They approved a referral April 19th, 2021, and he doesn't even get his surgery until September, and he's issued a ticket for complaining about the pain. And so to say, well, Wexford didn't know about it, it's in there. They knew about the referral. Now, they said, well, it wasn't in April. It was actually in June. The only reason he got a surgery was because he filed a pro se lawsuit against Wexford, and then I was asked to get involved. But for a pro se inmate filing a lawsuit, he would still not have a surgery, and he would be without his right testicle like he is today. You know, I want to emphasize that an inmate is not required to play Russian roulette involuntarily, and that's what Wexford is doing. It's an involuntary game of Russian roulette where they force a patient to suffer from a hernia, go through pain, go through disability. He can't walk. He's having to hold his scrotum up and denying pain medicine. They didn't mention that, not one pill. And even the time when they know about it, in April, they try to say, well, that was a typo. It was June. The reason they want to do that is they want to shorten the time frame between the time that they sent him for a consult until the time that he gets his surgery. Dr. Damati testified that the horse is out of the barn. Yeah, Mr. Plour, I want to go back to a Monell-related question. I totally understand your theory of him receiving negligent medical care. That's very clear to me. You've done fine on that. Okay, my question is how is Dr. Damati's expert disclosure, how does that comply with Rule 26, the disclosure required under Rule 26? It fully complies. It's a seven-page detailed report, seven pages, and we supplemented that December 1st with another 15 pages. So there were 22 pages of written disclosure. Yeah, it's not a matter of page counting. I've read them all. Yeah. And I'm not focused on his discussion of what your client suffered. Yeah. I'm not. Okay. It's the pattern and practice evidence or the lack thereof. Where is that disclosed? It's in there. I got it right here. Where? The December 1st supplement goes into that in detail where they have a pattern or practice of ignoring hernias. That's in the supplemental disclosure that was December 1st, 2020. I think it was 2021. Yeah, it's like a seven-page document or so? No, the seven-page document was the initial disclosure. Then there was a 15-page document, Your Honor. All right. Thank you. Thank you, counsel. The case is taken under advisement.